# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01759-COA

**JEFFERY SCOTT CADIGAN**                                                    **APPELLANT**

**v.**

**STEFANY ANNE (CADIGAN) SULLIVAN**                                  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/05/2018 |
| TRIAL JUDGE: | HON. MICHAEL H. WARD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | JOHN PAUL BARBER |
| ATTORNEY FOR APPELLEE: | DAVID JEFFREY WHITE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 07/21/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.

### GREENLEE, J., FOR THE COURT:

¶1.     In 2018, Scott Cadigan was ordered to pay child support to Stefany (Cadigan) Sullivan for their minor son, A.B.[1]  Scott appeals from the judgment of the Harrison County Chancery Court, claiming the special chancellor erred by finding that Stefany was not in arrears, that he was not entitled to an offset of his child-support obligation by the amount of Stefany's arrearage, that Stefany was not in contempt, and that he was not entitled to attorney's fees. Scott also claims that the special chancellor erred by failing to consider his claim for injunctive relief.  Finding no reversible error, we affirm.

---

[1] We use fictitious initials to protect identities in this opinion.

## FACTS AND PROCEDURAL HISTORY

¶2.    Scott and Stefany divorced in November 2004 in Okaloosa County, Florida.  Pursuant to the Marital Settlement Agreement and Shared Parenting Agreement ("SPA"), Scott and Stefany had joint legal custody of their minor son, A.B.  However, Scott was designated the "primary residential parent," and Stefany was the "secondary residential parent."  In December 2006, Stefany was ordered to pay child support to Scott in the amount of $428 per month, effective January 1, 2007.

¶3.    At some point, Scott and Stefany discussed reconciliation, and in November 2010, Stefany moved from Florida into Scott's house in Mississippi.  In December 2010, Scott assumed Stefany's child-support obligation.  He submitted the child-support payments through the designated depository on Stefany's behalf, and the money was routed back into his bank account.

¶4.    Around March 2011, Scott and Stefany determined that reconciliation was not possible.  However, in an email to Stefany, Scott stated that he would not demand child support as long as they were equally involved in raising A.B.  Specifically, Scott stated, "As for future child support, . . . I've explained my desire to have an equal partnership with you for at least [A.B.'s] . . . upbringing . . . .  In this case I would not desire to return to you paying child support."  In April 2011, Stefany moved out of Scott's house.  And A.B. began staying with Stefany on Mondays and Tuesdays and with Scott on Wednesdays and Thursdays, alternating weekends.

¶5.    In 2011, Scott and Stefany petitioned the Florida court to modify the child-support

payment procedure to allow Stefany to pay Scott directly instead of submitting payments through the depository.[2] In an affidavit, Scott stated that Stefany was current on child support payments as of October 31, 2011. And in November 2011, the court held that future child-support payments could be paid directly to Scott.

¶6.     According to Stefany, she and Scott continued their "50/50 arrangement." In an email dated May 20, 2013, Scott stated, in part:

> Several years ago, after you moved back to the area, even though we had a valid Shared Parenting Agreement limiting your visitation with [A.B.] to one evening a week and every other weekend, we agreed in [A.B.'s] best interest to evenly split visitation time with each other and forego you having to pay me child support. Since then, with the exception of a few instances, the visitation schedule has worked well for all of us.

¶7.     However, in January 2014, Stefany received a letter from Scott, which stated, "I am no longer in agreement with the 'modified' visitation schedule you created on/about February 2011. Therefore, all future visitation shall be in accordance with the Shared Parenting Agreement/Order (SPA) as filed November 16, 2004." According to Scott, he realized their "50/50 arrangement" was not "50/50," and Stefany was forfeiting a lot of her visitation with A.B.[3] After receiving Scott's letter, Scott and Stefany reverted to the visitation schedule set

---

[2] According to Stefany, she and Scott had discussed terminating the child-support obligation altogether. However, because the paperwork was complicated, they decided to simply ask the court to modify the payment procedure instead.

[3] According to Stefany, she missed visitation when she had a double mastectomy and cancer treatment in April 2012; when she had emergency surgery for kidney stones and an additional surgery due to complications in February 2013; when she went on vacation in May 2013; when she visited her other son in August 2013; when she had the flu in 2013; and when she went on vacation to celebrate being cancer free in January 2014. She also missed visitation due to a funeral and a football game, and she explained that work sometimes caused her to be late to pick up A.B. for visitation.

forth in the SPA. However, according to Stefany, Scott did not demand child support, the SPA did not address child support, and she was still sharing equally in A.B.'s expenses. So Stefany did not pay child support. According to Scott, he paid for all of A.B.'s expenses, with a few exceptions.

¶8. In June 2014, Scott requested that the Mississippi Department of Human Services (DHS) enforce the Florida child-support order "going forward." Scott did not request enforcement of child-support arrears.[4] According to Scott, he informed DHS that Stefany was not current on child-support payments. But he signed an affidavit stating that she was current through June 2014. According to Stephany, in August 2014, she was notified that DHS had started withholding a portion of her income for child support.[5]

¶9. On October 8, 2014, Stefany filed a "Petition to Enroll Foreign Judgment, For Temporary Relief, Modification of Judgment and Contempt" in the Harrison County Chancery Court. Stefany claimed that a portion of her income was being withheld for child support at a higher rate than allowed by Mississippi law. She requested a hearing to grant an abatement of child-support payments or, alternatively, to modify the amount to conform with Mississippi's statutory guidelines. Stefany also asked the court to find Scott in contempt and grant her custody of A.B., child support, and attorney's fees.

¶10. Subsequently, Scott filed an answer to Stefany's petition and raised the defense of unclean hands. Scott also filed a counter-complaint for contempt and attorney's fees, and he

---

[4] At trial, Scott testified that he believed he had to hire an attorney to collect arrears.

[5] According to Stefany, DHS withheld an additional amount for July 2014.

4

asserted that Stefany had been filing "untrue pleadings."

¶11.  On November 3, 2014, the parties entered an agreed temporary order.  The order modified the amount of Stefany's child-support obligation to $224 per month, beginning November 1, 2014.  However, the order stated:

> [Scott] reserves all right to preserve his defenses of unclean hands, voluntary reduction of income, and any other defenses or factual matters which may, following a trial on the merits result in a finding by the [c]ourt that child support should not have been reduced and reinstating the original figure to include payment of amounts voluntarily reduced during the pendency of this action.

¶12.  Scott and Stefany continued to file various pleadings.  Then, in August 2016, A.B. indicated that he wanted to live with Stefany.  As a result, in September 2016, Scott filed a "Third Amended Counterclaim."  Scott asserted that it would be in A.B.'s best interests to award custody to Stefany, subject to his visitation rights.  Scott re-asserted that Stefany was in contempt and that he was entitled to attorney's fees.  He also requested an offset of any future child-support payments by the amount of Stefany's arrearage.  And he requested a permanent injunction to enjoin Stefany from disparaging his character with respect to his relationship with Stefany's other son.

¶13.  Subsequently, Stefany filed an answer to Scott's third amended counterclaim.  She denied that she was in arrears or that she owed any child support.  And, among her defenses, she asserted estoppel and unjust enrichment.

¶14.  In September 2016, Stefany filed a motion to amend the temporary order.  She requested that the court suspend her child-support obligation and asserted that Scott should be ordered to return all payments and pay child support retroactively to August 7, 2016.  She

5

also requested sole physical custody of A.B., subject to Scott's visitation rights.

¶15.    On December 2, 2016, the parties entered another agreed amended temporary order. The order gave Stefany sole physical custody of A.B., and it suspended her child-support obligation. But the parties reserved all issues regarding "child support owed by either party or arrearage owed by either party" until trial. That same day, the court entered an "Order Enrolling Foreign Judgment."[6]

¶16.    After a trial, on October 5, 2018, the special chancellor entered a final judgment.[7] The special chancellor awarded joint legal custody with sole physical custody to Stefany, subject to Scott's visitation rights. With respect to child support, the special chancellor found that Scott had suggested an agreement in which child support would be suspended based on Stefany assuming partial custody. The special chancellor further found that Scott and Stefany shared equal or nearly equal time with A.B. According to the special chancellor, a judgment against Stefany would permit unjust enrichment and ignore the affidavits that Scott had executed with the Florida court and DHS. Therefore, the special chancellor held that Stefany was not in arrears. Additionally, the special chancellor held that neither party was in contempt nor entitled to attorney's fees. Scott was ordered to pay child support in the amount of $856.74 per month, retroactive to December 2016, and the arrearage Scott owed was $18,848.28.

---

[6] The record suggests that DHS continued to withhold a portion of Stefany's income for child support. An agreed temporary order was entered on April 5, 2017, which suspended Stefany's child-support obligation, effective November 30, 2016.

[7] The special chancellor previously issued an opinion letter, which was dated May 2, 2018.

¶17. Before the court entered its final judgment, Scott filed a motion for a new trial or, in the alternative, to alter or amend the judgment. Scott argued that the special chancellor's finding in his opinion letter that Stefany was not in arrears was against the overwhelming weight of the evidence. He requested that his child-support obligation be offset by the amount of Stefany's arrearage. And he argued that the special chancellor erred by finding that Stefany was not in contempt and by refusing to award attorney's fees.

¶18. After the denial of his post-trial motion, Scott appealed. Scott claims the special chancellor erred by finding that Stefany was not in arrears, that he was not entitled to an offset of his child-support obligation by the amount of Stefany's arrearage, that Stefany was not in contempt, and that he was not entitled to attorney's fees. Scott also claims that the special chancellor erred by failing to consider his claim for injunctive relief.

## STANDARD OF REVIEW

¶19. This Court's review of domestic relations matters is strictly limited. *Bryant v. Bryant*, 924 So. 2d 627, 630 (¶5) (Miss. Ct. App. 2006). We do not redetermine questions of fact. *Shows v. Cross*, 238 So. 3d 1224, 1232 (¶32) (Miss. Ct. App. 2018). "Therefore, 'a chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous.'" *Id*. (quoting *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (¶8) (Miss. 2002)). "Legal questions, however, are reviewed de novo." *Id*. (quoting *Sanford v. Sanford*, 124 So. 3d 647, 652-53 (¶21) (Miss. 2013)).

## DISCUSSION

### I. Arrears

7

¶20.    Scott claims the special chancellor erred by finding that Stefany was not in arrears. Scott concedes that Stefany was current on child support until November 2011.  He asserts that he was entitled to $428 per month from November 2011 until he went to DHS in June 2014.  Scott also claims that the special chancellor erred by reducing Stefany's child-support obligation to $224 per month and that he was entitled to the difference from November 2014 until December 2016.

¶21.    In holding that Stefany was not in arrears, the special chancellor relied on *Bryant v. Bryant*, 924 So. 2d 627 (Miss. Ct. App. 2006).  Bobby and Beth Bryant divorced in 1999 and had two minor children, Chad and Claire.  *Id*. at 629 (¶2).  "Beth was awarded primary and physical custody, while Bobby was awarded reasonable visitation."  *Id*.  The court ordered Bobby to pay Beth $600 per month in child support.  *Id*.  In 2000, "Beth and Bobby orally agreed that Chad would live with Bobby and Claire would remain with Beth."  *Id*. at 629 (¶3).  "[The] oral agreement provided that Bobby would pay all of the expenses for Chad, while Beth would pay all of the expenses for Claire."  *Id*.  "[The] agreement also provided that no child support would be exchanged between the parties."  *Id*.  "At no time during Chad's living with Bobby did Beth complain to the court about this living arrangement or Bobby's failure to pay child support."  *Id*. at 629 (¶4).  "Upon Chad's emancipation [by marriage], Beth filed a complaint for back child support and to hold Bobby in contempt."  *Id*.  "The chancery court ruled that to pay Beth for back child support and holding Bobby in contempt of the original order would provide Beth with a windfall profit from the oral agreement she made."  *Id*.  This Court affirmed the chancery court's judgment finding that

8

there was a valid extra-judicial agreement between the parties and that Beth was not entitled to "back child support." *Id*. at 630-31 (¶¶7, 10).

¶22. In this case, the chancellor's findings that Scott and Stefany agreed that child support would be suspended based on a shared-custody arrangement and that Scott and Stefany shared custody are supported by the record. In an email from March 2011, Scott stated, "As for future child support, . . . I've explained my desire to have an equal partnership with you for at least [A.B.'s] . . . upbringing . . . . In this case I would not desire to return to you paying child support." And in an email dated May 20, 2013, Scott stated, in part:

> Several years ago, after you moved back to the area, even though we had a valid Shared Parenting Agreement limiting your visitation with [A.B.] to one evening a week and every other weekend, we agreed in [A.B.'s] best interest to evenly split visitation time with each other and forego you having to pay me child support. Since then, with the exception of a few instances, the visitation schedule has worked well for all of us.

¶23. Stefany testified that she relied on her agreement with Scott. As was the case in *Bryant*, to pay Scott for back child support and hold Stefany in contempt would provide Scott with a windfall profit from the agreement that he made. Furthermore, we agree with the chancellor that in order to award Scott back child support, we would have to ignore the affidavit that he executed with DHS, stating that Stefany was current on child support as of June 2014. Accordingly, Scott is not entitled to any back child support.

¶24. Scott argues that *Bryant* is distinguishable because A.B. did not live with Stefany and Stefany did not provide direct financial support to A.B. However, according to Scott's email dated May 20, 2013, their "evenly split visitation time . . . worked well" with the exception of a few instances. Furthermore, the agreement to forego child support was based on shared

9

visitation, not financial support. Nevertheless, Stefany testified that when she had custody of A.B., she took care of his daily needs. According to Stefany, she spent "a considerable amount of money" based on her income to provide A.B. with what he needed while he was in her care. This Court has held that "since the chancellor is best able to determine the credibility of the witnesses' testimony, it is not the appellate court's province to undermine the chancellor's authority by replacing the chancellor's judgment with our own." *Chance v. Chance*, 191 So. 3d 1293, 1300 (¶24) (Miss. Ct. App. 2016). We find that there is no meaningful distinction between *Bryant* and this case.

¶25. In support of his claim that the amount of Stefany's child-support obligation should not have been modified, Scott argues that the court lacked jurisdiction. Specifically, Scott argues that the Florida child-support order had not been registered or enrolled when the Mississippi court modified the amount of Stefany's child-support obligation. Although Scott "adopt[ed] all jurisdictional averments of [the petitioner]" in his answer, subject-matter jurisdiction cannot be waived. *Miss. Dept. of Human Servs. v. Porter*, 237 So. 3d 799, 802 (¶8) (Miss. Ct. App. 2017).

¶26. Mississippi Code Annotated section 93-25-609 (Rev. 2018) states, in relevant part, that "[a] party . . . seeking to modify, or to modify and enforce, a child-support order issued in another state shall register that order in this state in the same manner provided in Sections 93-25-601 through 93-25-608 if the order has not been registered." Under Mississippi Code Annotated section 93-25-603 (Rev. 2018), "[a] support order . . . issued in another state . . . is registered when the order is filed in the registering tribunal of this state." Stefany filed a

"Petition to Enroll the Foreign Judgment" on October 8, 2014. The petition states that a copy of the Florida child-support order was attached as Exhibit D. Although the order enrolling the Florida judgment was not entered until December 2, 2016, the Florida judgment was registered when Stefany filed her petition. Therefore, the chancery court had jurisdiction.

¶27. Scott also argues that there was no evidence of a change of circumstances to warrant a reduction of Stefany's child-support obligation. In support of his argument, Scott cites to *Martin v. Borries*, 282 So. 3d 472 (Miss. Ct. App. 2019). Martin's contract as a project-manager consultant ended in May 2015, and while awaiting a new assignment, he relocated from China to Mississippi. *Id*. at 473 (¶3). According to Martin, "he was unable to find a new assignment with a comparable salary; so he lived off his savings and eventually took a job as an electrician with Ingalls Shipbuilding . . . ." *Id*. Subsequently, he filed a petition for modification of child support. *Id*. at (¶4). This Court held that there was "no manifest error in the chancery court's determination that Martin voluntarily reduced his income" and therefore was not entitled to a modification of child support. *Id*. at 476 (¶13).

¶28. This case is distinguishable. Although Stefany changed jobs, she did not file a motion for modification of child support because she had a reduction in income. Rather, she filed the motion for modification so that the amount of her child-support obligation would conform with Mississippi's statutory guidelines. Accordingly, this issue is without merit.

## II. Offset

¶29. Scott claims that his child-support arrearage should have been offset by the amount of Stefany's arrearage. However, as discussed, Stefany was not in arrears. Therefore, Scott

11

was not entitled to an offset. This issue is without merit.

### III. Contempt

¶30. Scott claims the special chancellor erred by finding that Stefany was not in contempt. This Court has held that "[c]ontempt matters are committed to the substantial discretion of the chancellor." *Durr v. Durr*, 912 So. 2d 1033, 1039 (¶17) (Miss. Ct. App. 2005) (citing *Lahmann v. Hallmon*, 722 So. 2d 614, 620 (¶19) (Miss. 1998)). "In a contempt action, when the party entitled to receive [child] support introduces evidence that the party required to pay the support has failed so to do, a prima facie case of contempt has been made." *Id.* at (¶18). "At this point, the burden shifts to the paying party to show an inability to pay or other defense." *Id.*

¶31. Scott argues that Stefany misrepresented her earnings and her ability to pay child support. And he asserts that Stefany should have been held in contempt for failing to pay child support when she had the ability to pay. However, regardless of Stefany's ability or inability to pay, Scott and Stefany entered an agreement in which child support would be suspended based on Stefany assuming half custody. Therefore, the chancellor did not err by finding that Stefany was not in contempt. This issue is without merit.

### IV. Attorney's Fees

¶32. Scott claims the special chancellor erred by finding that he was not entitled to attorney's fees. This Court has held that "[a]n award of attorney's fees is not to be given to a party who is unsuccessful in an action [he] initiates." *Bryant*, 924 So. 2d at 633 (¶26) (citing *Young v. Deaton*, 766 So. 2d 819, 822 (¶12) (Miss. Ct. App. 2000)). However, even

if a litigant prevails in his action, he must show something more in order to recover attorney's fees in most forms of litigation. *Id*.

¶33. To be awarded attorney's fees, Scott would as a threshold have to have been successful in his counterclaim against Stefany. He was not. As discussed, Stefany was not in arrears or in contempt. Therefore, this issue is without merit.

### V. Injunctive Relief

¶34. Finally, Scott claims the chancellor erred by refusing to consider his claim for injunctive relief. Prior to trial, Scott requested that Stefany be enjoined from disparaging his character with respect to his relationship with Stefany's other son. Scott also requested that Stefany be enjoined from referring to him as her other son's "biological father," "legal father by virtue of marriage," and "adoptive father." The chancellor held that because the other son was not a party to the action, the issue needed to be raised in a separate cause of action.

¶35. On appeal, Stefany claims that this issue is procedurally barred because Scott did not raise the issue in his post-trial motion and because he failed to cite to authority in his appellant's brief. It is true that Scott did not raise the issue in his motion for a new trial. *See Allcock v. Bannister*, 106 So. 3d 790, 797 (¶32) (Miss. 2012) ("[T]he purpose of a motion for a new trial is to give the trial court an opportunity to correct its own errors, or errors that have occurred in the conduct of the trial or proceedings . . . ."). However, because Scott failed to cite to any relevant authority, this issue is procedurally barred. *See Aaron v. Aaron*, 147 So. 3d 370, 374 (¶15) (Miss. Ct. App. 2014) ("Failure to cite to relevant authority results

13

in a waiter of the issue on appeal.").[8]

## CONCLUSION

¶36. After review, we affirm the judgment of the chancery court. Scott suggests that he is entitled to attorney's fees on appeal. But because Scott does not prevail in this appeal, his request for attorney's fees on appeal is denied. *See Smith v. Williams*, 199 So. 3d 705, 710 (¶17) (Miss. Ct. App. 2016).

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**

---

[8] In his appellant's brief, Scott cites to *McCorkle v. McCorkle*, 811 So. 2d 258 (Miss. Ct. App. 2001), and suggests that the chancellor dismissed his claim for injunctive relief under the doctrine of judicial privilege. However, the chancellor dismissed the claim because Stefany's other son was not a party to the action.